20-6125 United States v. Bullcoming, and Mr. Pincus, we are ready when you are. Thank you, Your Honor. May it please the Court. My name is Howard Pincus from the Federal Public Defender. I represent Tommy Bullcoming. The BIA agent who arrested Mr. Bullcoming turned him over to the Marshals that Friday afternoon, September 8th, but took Mr. Bullcoming's duffel bag home for the weekend. He kept it through the day on Monday, September 11th, while he investigated the case, and then checked it into the BIA's evidence repository that night. His search of the duffel that time was not a valid inventory search. Without what Agent Ware saw in the duffel on September 11th, the warrant affidavit did not contain probable cause. And because the admission of the evidence from the duffel bag was not harmless beyond a reasonable doubt, this Court should vacate Mr. Bullcoming's convictions and remand for a new trial. You said September, the September 11th inventory. That's correct, Your Honor. Yes, Your Honor. But the affidavit in support of the warrant talks only about the September 18th inventory, isn't that correct? Well, it talks about the blood that was found on Jordan's slides at that time, and if you take that out, then you would just have what's in the September 11th inventory. The government says that the September 18th inventory is proper as a second look, but it can't be a second look if the first look was improper, and that's the September 11th inventory. Okay, there's nothing in Illinois v. Lafayette that says that either the September 11th or the September 18th inventory search were improper as inventory searches, correct? Oh, Illinois v. Lafayette says a booking inventory is permissible, and it says a booking inventory is an incidental administrative step following arrest and preceding incarceration, which takes place at the station house. This is something three days later. Now, in Colorado v. Bertine, the Supreme Court did say that Illinois v. Lafayette, the station house setting was not critical to its holding, but the context there really matters. What the court was doing was rejecting the Colorado Supreme Court's distinguishing of Lafayette about safety concerns at the jail. In that case, the Colorado Supreme Court said the same safety concerns don't apply to the impoundment of an automobile and the opening of closed containers in the automobile. The mere fact that the station house setting safety concerns are present outside of the station house setting doesn't mean that in Illinois v. Lafayette, the Supreme Court was inventory searches that don't take place at the station house or reasonably promptly after arriving there. It certainly couldn't apply to something three days later as here. Let me understand your position. Is your position that neither of these searches qualify as inventory searches? Because number one, they were done remotely, and number two, they were done well after the arrest of the defendant. Is that your position? That's correct, Your Honor. And where's your authority for either one of those two disqualifications? Illinois v. Lafayette talks about its booking inventories, which is what this supposedly was, being an administrative step following arrest and preceding incarceration. And we have this well after. And the purposes that an inventory search is meant to serve are further when those interests are ensured when there is a prompt inventory at the station house. But wait a minute. Here we have basically somebody, this Micah Ware, is that his name? Correct, yes. Who is able to actually give custody and control testimony that establishes the whereabouts of this 18? And it verifies that what is in there. And just because I don't understand why it's important that it's not done at the station, because it satisfies the purposes of Lafayette. And that is, it satisfies the fact that jail employees can't steal stuff of incarcerated defendants. And it protects the jail and the administration for fraudulent claims by an incarcerated person that his goods have been stolen. It satisfies all those things. And that's the purpose of inventory search. So I don't understand why this shouldn't qualify. That is the purpose, but this doesn't satisfy. The court in Lafayette said it's not unheard of to take things out of property. And we need to protect against, we need to protect the property and we need to protect against false claims. And that's done by a reasonably prompt inventory. And as the court said in Lafayette, and I'm quoting here, a standardized procedure for making a list or inventory as soon as reasonable after reaching the station, not only deters false claims, but inhibits theft or careless handling of articles taken from the arrested person. And that's not satisfied here, where we have a three days that the property is, a bag is in Agent Ware's possession with nobody else around. Mr. Bullcoming's not there. No other officers are there. It necessarily compromised those interests. If instead, Mr. Ware or Officer Ware had put the bag unopened in a locker in the evidence room at the police station, waited three days, took it out and inventoried it, would you still have an objection saying that it wasn't a proper administrative inventory search? I think we because we don't know who else could have access to that. It's in an evidence locker. It's in the evidence room. It's in a locker and it's controlled access. So no one else has touched it. Mr. Ware comes back three days later when he has time and he inventories everything that's in that bag. Well, the whole point of doing it at time is to answer my question first. But it's to guard against that misconduct and misconduct can occur in the type of scenario that you're positing, Your Honor. And in any event, what we have here is something entirely different. We have him taking the bag home. Certainly an unusual thing. What I'm trying to get you to focus on first, I want to understand your argument. Is your argument just time passed or is that it was uncontrolled during the time that that it passed? It seems to me if you have it controlled and no one else has access to it, the fact that you later inventory it doesn't in any way impact the Lafayette rationale. Well, Lafayette does say as soon as reasonable after reaching the station. And it's not as soon as reasonable if they put in a locker and do it three days, three weeks, three months later. It depends on what was going on in those three days, doesn't it? It's not always unreasonable, is it? Well, I think what the Supreme Court was doing in Lafayette was saying, here's an easy to follow rule. Do it as soon as you get to the station. And that eliminates all of these collateral inquiries. But in any event, even if you posit that there are some it's certainly not this case where the officer takes the duffel bag home with him. And we only have his word about things. And then he takes it while he's investigating the crime. What's wrong with just having an officer's word about it? You can cross examine him. Actually, the facts in this case seem to me more reasonable than even the hypothetical Judge McHugh stated. He was locked up in his car because, you know, under the circumstances, wasn't it reasonable for him to he'd been up for two days or something to just go home and leave it locked in his car and nobody had access to it? Well, no. First of all, the rule of Lafayette is there there is a recognition that police sometimes engage in misconduct. Second, what should have happened is his bag should have gone with him to the jailers and the jailers were the federal marshals. Instead, Agent Ware took it with him. And he even acknowledged that if this were evidence, and of course, the duffel bag wasn't evidence, it was Mr. Bull Cummings' property, what what the rules required was for him to check it in that evening. He didn't do that. He waited three more days, took it home with him, investigated the case. That's not following procedure. That's not reasonable under Illinois versus Lafayette. Now, let me let me turn you because you're running out of time to the issue of whether even if we were to eliminate from the from the inventory search, isn't there enough in that affidavit that they had probable cause? No, they have probable cause, they might have probable cause to believe that Mr. Bull Cummings is involved in the events of that of September 6th when there was the arson and the murder. What they don't have is a fair probability that the bag will contain any evidence of that. And the reason they don't have that is Mr. Bull Cummings' actions at his arrest. He asked, affirmatively asked, that his bag be brought with him. He already knew that the police suspected him of the arson. And of course, if he was the perpetrator, he would know there was a murder as well. And well, I guess that assumes that he knew there were traces of blood on some of his clothing. And we just and and I think it's fair to assume that he didn't think there was blood on the clothing. If he even thought that the only evidence was that this murder was very bloody. If he even thought that there was anything in the bag that might remotely link him to the events of that evening, he certainly wouldn't have asked that the bag be taken with him. He That's what makes it unreasonable to think that the bag would contain any evidence of the events of September 6th of that night with the arson and the murder. Do you have any evidence? I'm sorry, go ahead. Do you have any case law that gets where you're going on that? Because it sounds to me a lot like a person who has drugs in the trunk of their car and the police say, you mind if I take a look back there? And they're like, oh, well, by all means, look. And then they open it up. And there's some drugs there. And he said, well, I didn't know that was there. And the proof is, is that I told you to look there. I mean, that's it. Do you have anything, you know, that would support what you're saying as like from a case? Just no, just a fair probability standard. And the difference in that case is the person there is may think if I don't answer the question, that will look suspicious. If I don't give permission, that will look suspicious. I might as well take my chances here. The police said they were going to leave the bag there. Mr. Bullcoming affirmatively put it in police hands. Why would he do that if he even remotely thought that it might contain anything that might conceivably connect him to an arson? And if he was the arsonist, a murder, maybe it's because that medication that was in there was very important to him. Well, the medication didn't. There's no reason to think that the medication was that critical. And if it was that critical, he could have asked somebody to get the medicine for him. If the choices between some medicine implicating yourself potentially in an arson and murder, it seems that the choice is clear. And there's not a fair probability to think that the bag would contain evidence of the murder or arson. Was there any evidence about the other contents of the bag, and that is the other clothing items? Was there any evidence that he was wearing that on the 6th or 7th of September? I don't believe there was, Your Honor. No. So the only evidence about the content is the evidence of the medication and the evidence of these gray slippers, flip-flops, sandals, whatever they were. Well, we know what was in the bag, but if you're asking was there anything that connected those to the events of that night, there wasn't. But if he was wearing those slides, and it was a bloody crime, all the more reason to think, why would you turn this over to the police and put in their hands? I see I'm running out of time. I'd like to reserve a few seconds for rebuttal. So let me ask you, the blood on his belt, that was his blood? That blood was never connected to anything. Okay, so we don't know whose blood that was. They weren't able to tell, right? I don't think it was thought to have anything to do with the night. I mean, I don't know if there was any proof as to when it came to be on his belt, or certainly it wasn't linked to Ms. Zotai. Yeah, and I'm going to ask another question, so I'm going to ask the panel to indulge me. What do we do with the fact that he gave permission to a police officer to go through that bag, and the police officer took everything out in order to look for the medicine? I mean, it doesn't look like he had much of an expectation of privacy if he said, hey, go ahead, dig through my bag. Well, that's actually not what he said. He said that his medicine was in the outside pocket. The officer said, I couldn't find it there, so I emptied out the bag. There's no indication that Mr. Bullcoming was saying, go into the bag, and there was no proof that the agent would ever see. Well, he did it with Mr. Bullcoming standing there. They were still, he said, it was right when they were coming in from the garage, as I understand the testimony, and my sense of it was that Mr. Bullcoming's standing right there as he's digging through the bag, looking for the medicine. I don't recall any instance where Bullcoming's saying, hey, I said you can only look in the bag. No, he didn't say that, but he did say my medicine is the outside pocket. That was his expectation that the officer would look where the medicine was, and in any event, what the agent saw at that time, there's no way to find on this record that it included the Jordan slides. The prosecutor didn't ask about that. He gave very ambiguous testimony about what was possibly in there. He never said the Jordan slide, and the prosecutor asked on September 18th when you did the second inventory after the September 11th inventory, did you know there were slides, the Jordan slides in there, and of course, by that time, he knew from the September 11th inventory, so we would ask that this court vacate Mr. Bullcoming's convictions and remand for a new trial without the evidence that was in the duffel bag. Thank you. Thank you. Mr. Krager. Thank you, Your Honor. I may please the court. Stephen Krager on behalf of the United States. The district court properly denied Mr. Bullcoming's motion to suppress, and this court can take one of two avenues to affirm that ruling. First, as the court indicated through its questionings, one avenue is what the district court did here, and that's to excise the one sentence in the search warrant affidavit that deals with the September 18th attack. Let's stop on that one first. As I understand Mr. Pincus's response to that, it is that while if you excise that information, you might have probable cause that he was involved in this murder, but you don't have probable cause to believe that any evidence of his involvement would be found in the duffel bag. Well, yes, Your Honor, so I think there are two responses to that. First, I think Mr. Pincus's argument, if I remember correctly, is that probable cause was initiated by the fact that Mr. Bullcoming asked Special Agent Ware to take the bag with him, and I think Judge Carson's scenario was something that I was actually going to bring up, which is this court's cases and Supreme Court cases are full of instances where defendants give consent to search, where they have kilos of drugs, where they have ample evidence of crimes in the locations they consent to search. So it defies judicial reasoning to say that there can't be probable cause simply because Mr. Bullcoming asked that the bag be taken with him. The second has to do with the fact, and this was laid out by the district court in its orders, at least two specific facts that were observed by Special Agent Ware that were included in the affidavit that link or that give at least a reasonable probability that DNA evidence would be found. The first is Special Agent Ware saw a surveillance video that recorded Mr. Bullcoming approximately one hour after the murder and arson in Elk City, and he had blood on his right palm and his left ring finger at the time, and then when he was arrested some 26-27 hours later, he had several cuts and scrapes on his arms, hands, and legs, a swollen right hand, and blood on his belt, indicating not only the blood on his belt, that there was blood on clothing, but that there was blood on both hands an hour after the murder. There wasn't blood on his clothing, and so presumably he either would have reached into the bag or he would have had to retrieve some sort of clothes. Whether or not the precise bloody clothing would have been in the bag is ultimately irrelevant. The question would be, is there any testable DNA there? And the district court could reasonably infer that based on the blood on Mr. Bullcoming's hands, and the blood on the belt 26 hours later, that there would be testable DNA on the clothing inside the bag. So in addition to that, Special Agent Ware was aware that there was clothing in the bag. First of all, whenever Mr. Bullcoming was in custody in El Reno, and this is page 78 of Volume 4 of the Record on Appeal, Mr. Ware, or excuse me, Mr. Bullcoming asked Special Agent Ware to retrieve a shirt from him from that bag. And then, as has been noted in Mr. Pincus's argument, there was the entire situation in the Marshall-Sally Port where Mr. Bullcoming had asked for medicine, Special Agent Ware couldn't find the medication in the pocket, and so he dumped out the contents of the bag trying to locate the medication. Let me ask you this, and this sort of goes to a question that Judge McHugh was asking Mr. Pincus earlier, and where does consent come into this? Because is there a point at which Mr. Bullcoming authorized entry into that bag so many times that he lost his expectation of privacy in its contents? I think under the Second Look Doctrine, this court could sit, because the entire purpose of the Second Look Doctrine, I think, goes to your point, Judge Carson. The Second Look Doctrine essentially says police have already reached this expectation of privacy and had the authority to do so, and so they're not going committing, they're not going any further than the search they've already committed. So all of this was already laid out, and there was a consent search, and my understanding is Mr. Bullcoming doesn't challenge the consent search in the Marshall-Sally Port, and so the Second Look Doctrine could cover all of this. I think that would be my answer to your question, Judge Carson. But the court doesn't ultimately have to consider the Second Look Doctrine, or the Second Would be a proper way of looking at it, a way of disposing of the case. Alternatively, if we want to start with the September 11th inventory search, the government would submit that was a proper inventory search. Mr. Bullcoming has argued that Lafayette controls this case, but what Lafayette did was take a discrete factual scenario. The inventory search occurred after arrest at the without overruling, cited favorably, cases like Edwards, where there was a 10-hour delay after booking. There are additional cases, such as Johns, where there was a three-day delay between the seizure of the boxes there and the warrantless search. Cooper is probably the most applicable. Cooper dealt with a seizure of a vehicle that was ultimately going to be forfeited, and the vehicle wasn't inventoried for a week. The Supreme Court explained that the rationale for the inventory search still existed because police were going to be keeping the vehicle for at least four months. The same matter that here, I mean all of these other cases, it's the police that are holding the item to be searched, and so they have control of it. Here, you know, the sheriff throws it in the back of his truck and drives it home for the weekend. Well, your honor, would I have preferred that Special Agent Warrick checked it into police, into evidence lockup before he went home? Yes. I think probably the most direct answer to that is he testified at the suppression hearing that it was secured in the hard back portion of his truck, that he was the only one that had any keys. As I understand your argument, you're saying it goes to the chain of evidence, the control of the evidence, and might be a grounds for cross-examination or impeachment, but that it doesn't affect whether it's a legitimate inventory search. I think that's correct, and I think that there are two independent interests in conducting an inventory search. Yes, Special Agent Warrick may have opened himself up to allegations between when he took the evidence home and when he conducted the inventory search on September 11th, but the BIA has a separate interest once it's checked into their evidence lockup, and so as part of checking it into the BIA evidence lockup that occurred on September 11th, Special Agent Warrick had to conduct an inventory search. He is part of the tribal police? He's a BIA Special Agent. Okay, and so he would use their facilities to secure evidence in much the same way a county would in securing evidence that was ultimately used in a federal prosecution. Is that fair? I believe so, yes. And I want to ask you about the September 18th search. I have concerns about that being a legitimate inventory search because the purpose was clearly investigatory. It was to support the search warrant affidavit, and it wasn't just administrative to try and protect the officers from a claim of stolen property or a claim by the defendant that there was more property. I mean, isn't that a very different animal than the September 11th search? It is very different. Special Agent Warrick testified that the reason he conducted the search wasn't to root around looking for evidence. What he was doing was getting the specific attachment B to the search warrant affidavit. The purpose is very different at that point than it was on the September 11th. I mean, September 18th, the purpose of that search is to support the investigation and prosecution. Correct, and that's why ultimately we're relying on the second look doctrine to support the September 18th search. When you say that, Mr. Krieger, on the second look, are you saying the first look was at the time of the arrest, or the first look was on September 11th? Well, yeah, I think there's arguments. There's an argument that there were about three first looks that were supported, two by consent, the first in El Reno, the second at the Marshall-Sally Port, and then the third on September 11th. What was the second? The first would have been when he got the shirt in El Reno. Mr. Bookleman asked for a shirt in El Reno, and Special Agent Warrick retrieved it from the bag. The second would have been, and I think is probably the most comprehensive one, would have been when Special Agent Warrick, looking for the medicine, dumped out the entire contents of the bag and saw everything that was in there on September 8th, and that would have been in Oklahoma City. And then the third one would have been the inventory search on September 11th. The first two would have been supported by consent, the second one, or the third one, the one in the inventory search would have been an inventory search, not a consent. And so as far as the second look doctrine, what we needed is going no further than police had already gone, and dumping out the entire contents of the bag on the Marshall-Sally Port floor was no further than what Special Agent Warrick did whenever he was going through taking an inventory, or setting forth in the attachment B, to avoid using the word inventory, setting forth in the attachment B the precise contents of the bag. If there are no further questions on the suppression issue, I know there's a second issue that Mr. Pincus didn't reach. I'm happy to answer any questions there might be on that. Do you want to talk about harmless air or not? I think harmless air largely set out in the brief. The only thing I'll mention about harmless air is, as far as the search goes, as far as the suppression issue goes, is that the connection that the DNA evidence from the bag brought was to tie, to put DNA evidence of Mr. Bullcoming and Ms. Zotai together. And that was still provided, and this is pages 1147 and 48, the volume four of the Record on Appeal, that same link was established by DNA in Ms. Zotai's vehicle. But this evidence of blood on the slipper, correct? I would have to be, I mean, I'm not 100% sure, but I believe there was blood evidence in her vehicle as well. Oh, no, no, okay. That is associated with the defendant or his belongings. The only blood of hers was on this slipper, correct? I believe that's correct. All right. And the evidence was pretty clear, at least as to the condition of the victim, was this was a pretty bloody event, right? Yes, she was stabbed multiple times. And so if the only evidence of the victim's blood that's associated directly with the defendant or his belongings is eradicated, isn't that a real problem? Doesn't that indicate that the error was not harmless? Well, I think it becomes a very close question. I would still submit that there was the DNA link from the blood that was in Ms. Zotai's vehicle as well. And if memory serves me right, I'd have to double check on pages 1147 and 48, that there was DNA from both Ms. Zotai and Mr. Bullcoming. It's been a few days since I've read those pages, and so I can't confirm that 100% accuracy. But in the end, the court doesn't need to reach harmlessness because either the affidavit on its own is sufficient or the searches were permissible under the law. Unless the court has any further questions, I'd ask the court to affirm the judgment in the sentence below. Thank you. Thank you. We will take this matter under advisement.